**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GRAND TRAVERSE BAND OF OTTAWA
AND CHIPPEWA INDIANS,
a federally recognized Indian tribe,
2605 N.W. Bayshore Drive
Peshawbestown, MI 49682

         *Plaintiff*,

  v.

NATIONAL INDIAN GAMING
COMMISSION,
1849 C Street NW
Washington, DC 20240

         *Defendant*.

Case No. 26-cv-2037

**COMPLAINT**

Plaintiff, the Grand Traverse Band of Ottawa and Chippewa Indians ("Band"), a federally recognized tribal government, brings this case against the National Indian Gaming Commission (NIGC) and states as follows:

### INTRODUCTION

1.      The Band brings this suit to prevent the NIGC from shutting down a tribal gaming operation based on a regulatory requirement that finds no support in the text or purpose of the Indian Gaming Regulatory Act (IGRA) and is wholly inconsistent with the NIGC's and Department of the Interior's past interpretation of IGRA—an inconsistency that was not acknowledged, let alone explained, when the regulatory requirement was adopted.

2.      Nearly a year and a half ago, the Band opened the Crystal Shores Casino in Benzie County, Michigan, where the Band's members and ancestors have lived for centuries. The Casino employs approximately forty people (including many Band members), providing good pay and health care benefits in a rural area where reliable, year-round jobs are hard to find. By generating tribal revenue and providing Band members with high-quality jobs, the Casino exemplifies IGRA's goals of "promoting tribal economic development, self-sufficiency, and strong tribal governments," 25 U.S.C. § 2702(1). The Casino has also engendered the strong support of the local community—the Benzie County Board of Commissioners and the Benzie County Sheriff have expressed their wholehearted support for the Casino's operation and their appreciation for the Casino's boost to the local economy.

3.      The Casino is fully compliant with IGRA. While IGRA generally prohibits tribal gaming on lands acquired after 1988, it creates an exception for lands "taken into trust as part of … the restoration of lands for an Indian tribe that is restored to Federal recognition." 25 U.S.C. § 2719(b)(1)(B)(iii). This provision, commonly referred to as the "restored lands exception,"

1

exists to protect the interests of tribes that, like the Band, suffered wrongful termination at the hands of the United States government and lost their ancestral lands in the process. And the land at issue here plainly satisfies the restored lands exception—the Casino is located in an area of great historical and present-day importance to the Band, on a parcel of land (the "Benzie Parcel") put into trust for the Band shortly after the Band's restoration to federal recognition.

4.      Nevertheless, the NIGC has taken regulatory action against the Band. It bases such action solely on a regulatory requirement known as the "one-bite rule," which was promulgated by the Department of the Interior ("Department" or "Interior Department") and which provides that land is not eligible for gaming under the restored lands exception if the tribe already operates a gaming facility elsewhere.

5.      But the one-bite rule is invalid for multiple reasons. It contravenes the text and purpose of IGRA's restored lands exception, IGRA's broader statutory goals, and the Indian canon of construction. Moreover, its adoption marked an arbitrary and capricious change in agency policy: The rule departs from the NIGC's and the Interior Department's prior interpretation of the restored lands exception, yet the Department never acknowledged—let alone explained—this change when it promulgated the rule.

6.      Accordingly, the NIGC's actions against the Band based on the one-bite rule contravene federal law, exceed the NIGC's authority, and are arbitrary and capricious.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1362. The Band maintains a government-to-government relationship with the United States and has a governing body duly recognized by the Department. It brings these claims under federal

law, including IGRA, 25 U.S.C. §§ 2701–2721; the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the actions or omissions giving rise to the claims occurred in this District, and the defendant is an agency of the United States located within the District.

## PARTIES

9.      Plaintiff, the Band, is a federally recognized Indian tribe whose governing body is recognized by the United States, as confirmed in an official list published by the Secretary of the Interior. *See* Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 91 Fed. Reg. 4,102, 4,103 (Jan. 30, 2026). It has approximately 4,200 enrolled citizens, roughly half of whom reside in the Band's six-county service area consisting of Antrim, Benzie, Charlevoix, Grand Traverse, Leelanau, and Manistee counties in the State of Michigan. The Band maintains governmental offices in Antrim, Benzie, Charlevoix, Grand Traverse, and Leelanau counties.

10.      Defendant, the National Indian Gaming Commission (NIGC), is charged under IGRA with regulating tribal gaming.

### HISTORICAL BACKGROUND: THE IMPROPER TERMINATION OF THE GRAND TRAVERSE BAND AND ITS RESTORATION TO FEDERAL RECOGNITION

11.      The Band's predecessors in interest, along with other bands of Ottawa and Chippewa Indians, entered into treaties with the United States in 1795, 1815, 1836, and 1855. *Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Att'y for W. Dist. of Mich.*, 198 F. Supp. 2d 920, 924 (W.D. Mich. 2002), *aff'd*, 369 F.3d 960 (6th Cir. 2004).

12.      In the 1836 Treaty of Washington, the bands ceded to the United States a large portion of territory that would become the State of Michigan, including the area in which the

3

Benzie Parcel is located. Treaty of Washington, Mar. 28, 1836, 7 Stat. 491. The United States failed to keep the promises made to the Band and other signatory tribes in return for the cession. The tribes "were deprived of their rights under the 1836 treaty …. [They] were cheated out of their land." *United States v. Michigan*, 471 F. Supp. 192, 207, 226 (W.D. Mich. 1979).

13. The United States promised that matters would be different with the 1855 Treaty, Jul. 31, 1855, 11 Stat. 621. Commissioner of Indian Affairs George Manypenny declared that the Treaty would create "a permanent home" for the Band and that "no trespasses will be permitted upon their territory or their rights[.]" 1855 Comm'r of Indian Aff. Ann. Rep. at 1, 18. This promise played out no better in practice, with Interior Department actions and omissions playing a significant role in the wholesale deprivation of the lands that had been pledged to the Band permanently. Instead of creating allotment lists that would have allowed Band members to make selections of land to be held in trust by the United States for their benefit, Interior Department agents facilitated shill transactions by which land speculators obtained title to thousands of acres of land the treaty had intended to remain in Band hands. As a result, the "[1855] promises proved to be as ethereal to the Indians as the [1836] promises which they replaced." *United States v. Michigan*, 471 F. Supp. at 243.

14. In 1872, Secretary of the Interior Columbus Delano failed to undo the shill transactions or to take any other action to defend the Band's rights. Instead, he severed the government-to-government relationship between the United States and the Band, erroneously declaring that the 1855 Treaty had been a termination agreement and that with the making of the final annuity payments in the spring of 1872, "tribal relations will be terminated," *Grand Traverse Band*, 369 F.3d at 961 n.2 (quoting Secretary Delano). The Secretary then worked closely with Michigan's Senators to craft federal legislation that ratified the dispossession of the

lands that had been solemnly promised to the Band. By 1900, ninety-nine percent of the land base promised to the Band as a permanent homeland in the 1855 Treaty was gone. The Band was left landless and financially destitute, and it endured decades of grave hardship as a result, *see id.* at 969.

15.     Notwithstanding its lack of resources, the Band fought tirelessly to regain the federal recognition, land, and rights that the Interior Department had improperly stripped from it. In 1934, the Band petitioned for federal recognition under the Indian Reorganization Act. As the Department's Office of Federal Acknowledgment later explained, the Bureau of Indian Affairs at the time "acknowledged that [the petitioners] were indeed Indian" but denied them recognition for reasons no longer considered legitimate—that is, "because the Bureau did not have sufficient funds to undertake the additional obligation" and "justified this by claiming that the Indians were highly acculturated … and that Bureau services would be a set back to the continued acculturation of the group." Dep't of Interior, Office of Fed. Acknowledgment, Recommendation and Summary of Evidence for Proposed Finding for Federal Acknowledgment of the Grand Traverse Band at 3 (Oct. 3, 1979).

16.     In 1980 the Band's status as a federally recognized tribe was finally re-established when it became the first tribe recognized by the Interior Department pursuant to the federal acknowledgment process promulgated at 25 C.F.R. Part 83 in 1978. *See* Determination for Federal Acknowledgment of the Grand Traverse Band of Ottawa and Chippewa Indians as an Indian Tribe, 45 Fed. Reg. 19,321 (Mar. 25, 1980); *see also Grand Traverse Band*, 369 F.3d at 962.

17.   In 1984, the Interior Department placed into trust a 12.5-acre parcel in Leelanau County and proclaimed it to be a reservation. *See* Grand Traverse Band of Chippewa and Ottawa Indians Establishment of Reservation, 49 Fed. Reg. 2025-01 (Jan. 17, 1984).

18.   To begin to address its economically distressed situation, the Band opened the Super Bingo Palace on the 12.5-acre parcel in 1984. Today the Band's Leelanau Sands Casino is located in the immediate vicinity.

19.   The Interior Department refused to place any other land in trust for the Band unless the Band first amended the membership requirements in its Constitution to exclude members who were not born or living within what the Interior Department considered the Band's core five-county area (which included Benzie County). Although questions about tribal membership are widely viewed as within the sole province of tribal governments, the Band was forced to acquiesce in March 1988 to limiting its membership base roll to a six-county service area (which again included Benzie County) so that the Interior Department would approve the Band's Constitution. Only then did the Interior Department begin to take additional land into trust for the Band.

20.   The Interior Department put 130.74 acres of land into trust for the Band in March and April 1988. The following year, it placed into trust for the Band a parcel of land in Grand Traverse County known as the Turtle Creek site, and over the ensuing decade it took ten additional parcels of land into trust for the Band, including the Benzie Parcel.

### THE RESTORED LANDS EXCEPTION
### OF THE INDIAN GAMING REGULATORY ACT

21.   In October 1988, Congress enacted the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721, which created a statutory framework for regulating Indian gaming and which had

as its stated goals "promoting tribal economic development, self-sufficiency, and strong tribal governments, *id.* § 2702.

22.     Section 2719 of IGRA generally prohibits gaming on any lands taken into trust by the Secretary of the Interior for the benefit of an Indian tribe after October 17, 1988. *Id.* § 2719(a). However, an exception to this general prohibition exists for lands "taken into trust as part of … the restoration of lands for an Indian tribe that is restored to Federal recognition." *Id.* § 2719(b)(1)(B)(iii). This exception is widely referred to as the "restored lands exception."

23.     As the plain text of Section 2719 makes clear, for a tribe to avail itself of the restored lands exception, it must satisfy two requirements. First, the tribe must have been "restored to Federal recognition[.]" *Id.* Second, the land on which it wishes to open a gaming facility must have been "taken into trust as part of … the restoration of [the tribe's] lands." *Id.*

**THE TURTLE CREEK CASE: THE PATHMARKING CASE INTERPRETING THE RESTORED LANDS EXCEPTION**

24.     In 1996, relying on the restored lands exception, the Band opened the Turtle Creek Casino in Grand Traverse County on land that had been taken into trust by the Interior Department in 1989. The Interior Department initially objected, insisting among other things that a tribe recognized through the Part 83 administrative process (rather than through federal restoration legislation) could not be a "restored tribe" under the restored lands exception. This position engendered the first litigation interpreting Section 2719's restored lands exception when the Band was forced to sue the United States for a declaratory judgment to establish that it is a restored tribe and that the Turtle Creek site is restored land. The State of Michigan intervened as a defendant.

25.     The United States moved for a preliminary injunction to shut down the Turtle Creek Casino pending a final resolution of whether the site was eligible for gaming under the

7

restored lands exception. The district court denied this motion, ruling that all four factors of the preliminary injunction test weighed against requiring the casino to shut down. *Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Att'y for the W. Dist. of Mich.*, 46 F. Supp. 2d 689, 704–705 (W.D. Mich. 1999). The court explained that a shutdown would have major negative consequences, including that the Band would be deprived of revenue and that "numerous families within and without the Band, who are employed by Turtle Creek, [would] have their livelihoods interrupted." *Id.* at 705.

26.     The United States withdrew from the Turtle Creek litigation after the NIGC concluded in a detailed opinion (and the Interior Department concurred) that the Band had in fact been "restored to federal recognition" and that the Turtle Creek site did qualify as land "taken into trust as part of … the restoration of lands for an Indian tribe." This left the State as the sole defendant.

27.     The district court agreed with the position of the Band and the United States that the Turtle Creek site is gaming-eligible under the restored lands exception. The court held that a tribe whose recognition is taken away and later recognized by the federal government through the Part 83 process is "restored" under the plain text of the restored lands exception. *Grand Traverse Band*, 198 F. Supp. 2d at 932. The court also held that the Turtle Creek site qualified as "land taken into trust as part of … the restoration of lands for an Indian tribe," reasoning that the site was "part of a restoration of lands in an historic, archeologic and geographic sense." *Id.* at 936. It explained that the land fell within the twenty-county area ceded by the Band to the United States in 1836 and lay 1.5 miles from the border of the Band's 1836 reservation, and further that the evidence established that the parcel was in an area of "historic, economic and cultural significance to the Band." *Id.* The court also noted that the "temporal proximity" between the

8

acquisition of the land and the Band's restoration to federal recognition in 1980 weighed in favor of finding that the land was taken into trust as part of a "restoration of lands" to the Band. *Id.* at 936–937. In an appeal in which the State challenged only the district court's holding that the Band is a "restored" tribe under the meaning of the restored lands exception, the Sixth Circuit affirmed the district court's decision. 369 F.3d at 960.

28.    Both the NIGC and the courts were aware when they issued their decisions that the Band was already operating its Leelanau Sands Casino and that the Turtle Creek Casino was its second gaming site. Not surprisingly, given the text of Section 2719, that fact had no bearing on their interpretation of the restored lands exception.

29.    The district and appellate court decisions in *Grand Traverse Band* have subsequently been cited widely by other courts, the NIGC, and the Interior Department as authoritative with respect to the interpretation of the restoreds land exception.

## THE PART 292 REGULATIONS AND THE ONE-BITE RULE

30.    In 2008, twenty years after the enactment of IGRA, the Interior Department promulgated regulations to implement Section 2719, which are found at 25 C.F.R. Part 292 ("Part 292 regulations"). While it was the Bureau of Indian Affairs within the Interior Department that promulgated the Part 292 regulations, the NIGC also applies the Part 292 regulations when implementing Section 2719 of IGRA, including the restored lands exception.

31.    The Part 292 regulations generally codify previous caselaw and administrative decisions interpreting the meaning of a "restored tribe" (25 C.F.R. § 292.7) and a "restoration of lands" (25 C.F.R. § 292.12). For land to qualify as "restored lands" under the Part 292 regulations, the tribe must have both "modern connections" and "a significant historical connection to the land," and "must demonstrate a temporal connection between the date of the

acquisition of the land and the date of the tribe's restoration." 25 C.F.R. § 292.12. These requirements mirror the approach to the restored lands exception first taken by the NIGC and the courts in the *Grand Traverse Band* litigation regarding the Turtle Creek site (and subsequently followed by other courts, the NIGC, and the Interior Department), except that the "temporal connections" prong includes the unprecedented requirement that the tribe may not be gaming on other lands:

> (c)   The tribe must demonstrate a temporal connection between the date of the acquisition of the land and the date of the tribe's restoration. To demonstrate this connection, the tribe must be able to show that either:
> (1)   The land is included in the tribe's first request for newly acquired lands since the tribe was restored to Federal recognition; or
> (2)   The tribe submitted an application to take the land into trust within 25 years after the tribe was restored to Federal recognition **and the tribe is not gaming on other lands**.

*Id.* (emphasis added).

32.     The requirement that "the tribe is not gaming on other lands," referred to herein as the "one-bite rule," finds no support in the text of the restored lands exception. Moreover, in adopting the one-bite rule, the Interior Department did not even acknowledge that it was changing its interpretation of the restored lands exception, let alone provide good reasons for the new policy.

### THE BENZIE PARCEL

33.     The Band acquired the Benzie Parcel on September 13, 1994, just six years after the Interior Department finally approved the Band's Constitution and no longer refused to take land into trust for the Band. The Parcel is located on the following premises situated in the township of Benzonia, County of Benzie, in the State of Michigan:

> [T]he east half (E1/2) of the southwest corner (SW1/4) except the north one (1) rod of Section 2, Township 25 North (T25N), Range 15 West (R15W), being a total of approximately 79.5 acres more or less, including assignment of an oil and

gas lease recorded on September 30, 1985 in Liber 209, Page 656 of Benzie County Register of Deeds[.]

34.    The Interior Department placed the Benzie Parcel into trust on April 21, 1999.

35.    The Benzie Parcel lies in an area of great importance to the Band. It falls within the lands ceded by the Bands to the United States in 1836, and in the vicinity of a village where Ottawa ancestors of the Band lived during the nineteenth century. A substantial number of Band members, including various elected leaders of the Band, continued to live in the area throughout the twentieth century and up to the present day. Today, over 130 Band members live in Benzie County, including at least 48 members who own or rent tribally operated units on the Parcel itself. The Band operates a tribal center and office on the Parcel, at which the Band hosts cultural events and community meetings, connects tribal members to medical services, and administers a polling station during tribal elections, among other activities.

36.    Under a proper interpretation of Section 2719's restored lands exception (i.e., one that does not graft in the invalid one-bite requirement), the Benzie Parcel qualifies as restored lands.

## THE BAND'S ESTABLISHMENT OF GAMING OPERATIONS ON THE BENZIE PARCEL AND NIGC RESPONSES

37.    On July 24, 2024, the Band informed the NIGC and the Interior Department that it intended to commence gaming on the Benzie Parcel. The Band provided a thirty-page letter and more than twenty supporting exhibits establishing that the Benzie Parcel is eligible for gaming under the restored lands exception. The Band provided formal notice to the Chairperson of the NIGC of its intention to issue a license for a gaming facility on the Benzie Parcel, as is required at least 120 days before the opening of a new facility, 25 C.F.R. § 559.2.

11

38.     On September 3, 2024, an NIGC staff attorney sent a letter to Band Chairwoman Sandra Witherspoon acknowledging receipt of the Band's letter and stating that the NIGC Office of General Counsel was working on an Indian lands opinion regarding whether the Benzie Parcel is eligible for gaming under the restored lands exception. (An "Indian lands opinion" is an advisory opinion, typically written by counsel for the NIGC or the Interior Department, regarding whether land is eligible for gaming under IGRA.)

39.     On December 19, 2024, after the required 120-day period under the statute had elapsed, the Band's Gaming Commission transmitted to the NIGC the facility license for the Crystal Shores Casino on the Benzie Parcel.

40.     On January 2, 2025, Rea Cisneros, Acting General Counsel of the NIGC, sent a one-page letter to Chairwoman Witherspoon, informing her that the NIGC was still working on the Indian lands opinion and had still not determined the status of the land, and "caution[ed] against opening a facility until the Indian lands question is resolved." The letter gave no indication as to how long it would take for the NIGC to decide whether the Benzie Parcel was eligible for gaming.

41.     On January 17, 2025, Chairwoman Witherspoon responded to Ms. Cisnero's letter to convey that, having satisfied the 120-day regulatory notification requirement, the Band intended to open the new facility promptly. She explained that gaming at the Benzie Parcel stands on firm legal footing, that the facility would provide much needed economic development and jobs, and that state and local officials were aware of the facility and had voiced no objections.

42.     On January 22, 2025, the Band opened the Crystal Shores Casino.

12

43.     Six months later (and a full year after the Band originally submitted its regulatory notice to the NIGC), on July 22, 2025, an NIGC staff attorney transmitted to Chairwoman Witherspoon an Indian lands opinion on the Benzie Parcel signed by NIGC Acting General Counsel Cisneros.

44.     The Indian lands opinion concludes that the Benzie Parcel is not eligible for gaming. This conclusion rests entirely on the one-bite rule: "Here, the Band's existing gaming facilities precludes a finding under Section 292.12(c)(2)." The Indian lands opinion does not address any of the arguments presented in the Band's July 24, 2024 submission as to why the one-bite rule is inapplicable and invalid.

45.     On October 15, 2025, the Band's Tribal Council adopted a resolution amending the Band's gaming ordinance to include site-specific language. Whereas the Band's existing gaming ordinance authorized Class III gaming on the Band's "Indian lands," the Tribal Council's resolution added language providing specifically that such gaming-eligible lands include the Band's Benzie Parcel.

46.     On October 16, 2025, the Band submitted the amendment to its gaming ordinance to the NIGC Acting Chairperson for approval, as required by 25 U.S.C. § 2710 and 25 C.F.R. § 522.3. As the Band and the NIGC discussed, the purpose of submitting the site-specific amendment was to generate a final agency action (which an Indian lands opinion generally is not) that would allow for judicial resolution of the validity of the one-bite rule.

47.     On January 8, 2026, the NIGC Acting Chairperson disapproved the amendment to the Band's gaming ordinance, again solely on the basis of the one-bite rule.

48.     On January 12, 2026, the NIGC Acting Chairperson issued NOV-26-01 (the "Notice of Violation" or "NOV"). The NOV contends that the Band's operation of gaming on

13

the Benzie Parcel violates IGRA, the Part 292 regulations, and the Band's gaming ordinance (which requires compliance with IGRA). The NOV does not dispute that the Band has demonstrated the requisite modern and historical connections to the Benzie Parcel under the restored lands exception. Like the Indian lands opinion and the disapproval of the gaming ordinance, the NOV identifies only the one-bite rule as a basis for concluding that the Band may not operate gaming on the Benzie Parcel: "The tribe is already operating two gaming facilities, Turtle Creek and Leelanau Sands, on other lands, disqualifying it from the [restored lands] exception."

49.    The NOV provides that "[t]o correct this ongoing substantial violation, the Tribe must … [i]immediately cease and desist all class II and/or class III gaming activities on the Benzie Parcel" and "[k]eep the facility closed to gaming until such time as the Tribe can demonstrate that the land is eligible for gaming under IGRA." It also states that the NIGC can impose "a civil fine against the Tribe in an amount not to exceed $65,655 per violation per day." However, as it subsequently confirmed, the NIGC issued neither a temporary nor permanent closure order to accompany the NOV.

50.    After receiving the NOV and the disapproval of its amended gaming ordinance, the Band promptly took action to expedite a final agency decision on the one-bite question, which would pave the way for judicial resolution of the issue. On January 15, 2026, it filed with the NIGC a Notice of Appeal of the disapproval of the gaming ordinance amendments and a Notice of Appeal of the NOV, weeks before these notices of appeal were due. The Band also waived its right to an in-person hearing, allowing the NIGC to resolve the appeals based solely on written submissions.

14

51.     On June 5, 2026, counsel for the NIGC transmitted to the Band a letter announcing the NIGC's "Final Agency Decisions" on the Band's appeals. The NIGC did not issue a decision or otherwise address the Band's arguments on appeal. Rather, the letter states that because the NIGC was not issuing a decision within ninety days of receiving the Band's appellate brief (which was filed on March 6, 2026), the NOV and the disapproval of the Band's amended gaming ordinance automatically "constitute final agency decisions of the Commission." Specifically, it explains as follows:

> NIGC regulations provide that the Commission shall issue its decision 90 days after receiving an appeal brief, which in this case is June 4, 2026. [*See* 25 C.F.R. §§ 582.7(a) & 585.7(a).] NIGC regulations further direct that "[i]n the absence of a decision of a majority of the Commission within the time provided, the Chair's decision shall constitute the final decision of the Commission," unless "the subject of the appeal is a temporary closure order …." [25 C.F.R. § 580.11.] Because no decision was issued by the 90-day deadline, NOV-26-01 and the disapproval of the Band's proposed site-specific amended gaming ordinance constitute final agency decisions of the Commission. [*See* 25 U.S.C. § 2714.]

52.     The NIGC's "final decision is a final agency action for purposes of judicial review." 25 C.F.R. § 580.10; *see also* 25 U.S.C. § 2714.

### THE BAND'S WRITTEN SUBMISSION TO THE NIGC REGARDING THE NOTICE OF VIOLATION

53.     On January 27, 2026, during the pendency of its appeal to the NIGC, the Band submitted a letter pursuant to 25 C.F.R. § 575.5(a), which allows for a tribe that has received a notice of violation to submit written information relevant to the NIGC Chairman's decision to impose a civil fine for the alleged violation. This letter requested that the Band "not be subject to a fine for continuing to operate the Crystal Shores Casino while the validity of the one-bite rule—the sole basis for NOV-26-01—is adjudicated." The letter explained that equitable principles, the public interest, and the factors in the relevant NIGC regulation governing the levying of fines all counseled against imposing any fine on the Band. Among other things, the

15

letter highlighted the Band's impeccable compliance with gaming laws and regulations since it began gaming in the 1980s, the Band's sincere and credible legal position against the one-bite rule, the Band's efforts to obtain a prompt resolution of this legal issue, the Band's consistent and good-faith communication with the NIGC and the Interior Department since submitting its July 2024 notice of intent to open a gaming facility on the Benzie Parcel, the economic boost and dozens of employment opportunities (for Indians and non-Indians alike) that the Casino is bringing to Benzie County, and the widespread support from the local community for the continued operation of the Casino. The letter also informed the NIGC that in light of the NOV, the Tribal Council had directed that net income from the Casino be segregated into a separate account and that no withdrawals be made from this account pending resolution of the Band's administrative appeal and any associated federal court proceedings; accordingly, if the federal courts were to uphold the one-bite rule, the NIGC could readily collect a fine based on the economic gain from operating the casino in the meantime. Attached to the letter were declarations in support of the continued operation of the Crystal Shores Casino from employees and management of the Crystal Shores Casino and from the Benzie County Sheriff, as well as a letter of support from the Benzie County Board of Commissioners.

54.    The Band has not received any communications from the NIGC responding to the substance of its January 27, 2026 submission.

**THE POSITIVE IMPACT OF GAMING ON THE BENZIE PARCEL FOR THE BAND AND LOCAL COMMUNITY**

55.    Benzie County has a seasonal economy that largely shuts down in the winter, making it difficult to find decent, year-round employment.

16

56. The Casino employs approximately forty people, whom it provides with steady pay, excellent health insurance (for them and their families), and a welcoming workplace. More than half of these employees are non-Indians who live in the local community.

57. Employment at the Casino has been transformative for Band members and their families. For example, Band member Paul McGrath Jr., who grew up in Benzie County and lives on the Benzie Parcel, is a single-father of five whose maintenance job at the Casino gives him the income to provide for his children and a schedule compatible with his childcare obligations.

58. A closure of the Casino would have devastating consequences for the Casino's employees and their families. Individuals like Mr. McGrath would face unemployment or need to travel a long distance to find a decent and stable job, jeopardizing their ability to provide for their children and elders. A closure would also have negative ripple effects throughout the local economy.

59. In the entire first year of operation, the Benzie County Sheriff's Office received only six calls to the Casino, and all for minor incidents such as an alarm accidentally going off and a "fender bender" in the parking lot. According to Benzie County Sheriff Kyle J. Rosa, "Receiving just six calls in a year is almost unheard of for a business the size of the Crystal Shores Casino. I have no concerns about Crystal Shores Casino contributing to crime in any way."

60. Sheriff Rosa and the County Board of Commissioners have voiced strong support for the continued operation of the Casino, citing the County's close working relationship with the Band and the economic benefit that the Casino has provided to the community.

### THE BAND'S SEGREGATION OF NET INCOME
### FROM THE CRYSTAL SHORES CASINO

61.     In the first eight months of operation, the Band generated approximately $2,300 per day in net income from the Casino. Since receiving the NOV, the Band has segregated net income generated from the Casino into a separate account, from which it will make no withdrawals pending resolution of this lawsuit.

### STANDING

62.     The NIGC's regulatory action on the basis of the one-bite rule threatens the Band with significant injury. The NOV states that the Band's operation of the Crystal Shores Casino is "in substantial violation of" IGRA and NIGC regulations; declares that in order to come into compliance, the Band must "[i]mmediately cease and desist all class II and/or class III gaming activities on the Benzie Parcel"; and confronts the Band with the possible "assessment of a civil fine … in an amount not to exceed $65,655 per violation per day." The NIGC thus threatens "concrete and imminent harm," *Biden v. Nebraska*, 600 U.S. 477, 489 (2023), to the Band. A closure order—or a fine that forces the Band to close the Casino—will cause Band members to lose their jobs, deprive the Band of governmental revenues, harm the Band's commercial relationships and reputation, and jeopardize its ability to ever reopen the facility.

63.     The Band's injury is "likely to be redressed by the lawsuit," *id.*, which seeks to vacate the NIGC's NOV and disapproval of the Band's gaming ordinance amendment and to enjoin the NIGC from taking any further action against gaming on the Benzie Parcel where such action relies on the invalid one-bite rule.

**CLAIM 1:**

**The Notice of Violation, the Disapproval of the Amendment to the Gaming Ordinance, and Any Further Enforcement Action Taken Against the Band on the Basis of the One-Bite Rule Are Contrary to Law and Exceed the NIGC's Statutory Authority.**

64. The Band restates, realleges, and incorporates by reference all preceding paragraphs and allegations.

65. Under the APA, 5 U.S.C. § 706(2)(A), this court must "hold unlawful and set aside" any agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"

66. Under the APA, 5 U.S.C. § 706(2)(C), this court must "hold unlawful and set aside" any agency action found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"

67. 25 U.S.C. § 2719(b)(1)(B)(iii) authorizes a tribe restored to federal recognition to engage in gaming on restored lands. The statute does not limit the restored lands exception to tribes that are not gaming on other lands.

68. The one-bite rule, adopted by the Interior Department in 25 C.F.R. § 292.12(c)(2) and subsequently applied by the NIGC, exceeds the authority of the Interior Department and the NIGC under IGRA and is not in accordance with law.

69. By issuing the notice of violation and the disapproval of the Band's amendment to its gaming ordinance based on the one-bite rule of 25 C.F.R. § 292.12(c)(2), the NIGC has acted contrary to the law and in excess of its authority under IGRA and the APA.

70. Any further enforcement action taken by the NIGC against the Band based on the one-bite rule of 25 C.F.R. § 292.12(c)(2) will be contrary to law and in excess of the NIGC's authority under IGRA and the APA.

19

**CLAIM 2:**

**The Notice of Violation, the Disapproval of the Amendment to the Gaming Ordinance, and Any Further Enforcement Action Taken Against the Band on the Basis of the One-Bite Rule Are Invalid Because They Rest on a Rule Adopted in Arbitrary and Capricious Fashion.**

71. The Band restates, realleges, and incorporates by reference all preceding paragraphs and allegations.

72. Under the APA, 5 U.S.C. § 706(2)(A), this court must "hold unlawful and set aside" any agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"

73. 25 U.S.C. § 2719(b)(1)(B)(iii) authorizes a tribe restored to federal recognition to engage in gaming on restored lands. The statute does not limit the restored lands exception to tribes that are not gaming on other lands.

74. Before adopting the Part 292 regulations, the NIGC and the Interior Department interpreted the restored lands exception such that land could qualify as eligible for gaming under the exception regardless of whether the tribe was already gaming on other lands.

75. In adopting the one-bite rule in the Part 292 regulations, the Interior Department acted arbitrarily and capriciously by failing even to acknowledge, let alone provide good reasons for, the fact that it was changing its interpretation of the restored lands exception.

76. By upholding the notice of violation and the disapproval of the Band's amendment to its gaming ordinance based on the arbitrary and capricious one-bite rule in 25 C.F.R. § 292.12(c)(2), the NIGC acted arbitrarily and capriciously and in violation of IGRA and the APA.

77.     Any further enforcement action by the NIGC against the Band based on the arbitrary and capricious one-bite rule of 25 C.F.R. § 292.12(c)(2) will constitute arbitrary and capricious agency action in violation of IGRA and the APA.

**PRAYER FOR RELIEF**

WHEREFORE, the Band respectfully requests that this Court:

A.     Declare that the requirement found in 25 C.F.R. § 292.12(c)(2) that a tribe "is not gaming on other lands" is inconsistent with the statutory text of the restored lands exception under 25 U.S.C. § 2719(b)(1)(B)(iii), and that action taken pursuant to this requirement accordingly is not in accordance with law and exceeds the NIGC's authority under IGRA.

B.     Declare that the requirement in 25 C.F.R. § 292.12(c)(2) that a tribe "is not gaming on other lands" marks an arbitrary and capricious change in agency interpretation of 25 U.S.C. § 2719(b)(1)(B)(iii), and that action taken pursuant to this requirement is likewise arbitrary and capricious.

C.     Vacate the NIGC's notice of violation and disapproval of the Band's amendment to its gaming ordinance to allow for gaming on the Benzie Parcel, on the grounds that they are arbitrary and capricious, not in accordance with law, and in excess of the NIGC's statutory authority.

D.     Enjoin the NIGC from taking any further action against gaming on the Benzie Parcel where such action relies upon the requirement in 25 C.F.R. § 292.12(c)(2) that a tribe "is not gaming on other lands."

E.     Award the Band its reasonable attorney fees and costs.

F.     Award the Band such other relief as the Court deems just and appropriate.

Dated: June 9, 2026

Respectfully submitted,

John F. Petoskey (pro hac vice application forthcoming)
General Counsel
GRAND TRAVERSE BAND OF OTTAWA AND CHIPPEWA INDIANS
2605 N.W. Bayshore Drive
Peshawbestown, MI 49682
(231) 534-7279
john.petoskey@gtb-nsn.gov

*/s/ Riyaz A. Kanji*
Riyaz A. Kanji, D.C. Bar 455165
Lucy W. Braun (pro hac vice application forthcoming)
Joshua C. Handelsman, D.C. Bar 888252619
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com
lbraun@kanjikatzen.com
jhandelsman@kanjikatzen.com

*Counsel for Plaintiff Grand Traverse Band of Ottawa and Chippewa Indians*

22